## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

CITY OF BOCA RATON GENERAL EMPLOYEES
PENSION PLAN,
350 Camino Gardens Blvd.
Boca Raton, FL 33432

on behalf of itself and all others similarly situated,

*Plaintiff,*

vs.

HARMAN INTERNATIONAL INDUSTRIES INC.,
DR. SIDNEY HARMAN, KEVIN BROWN, and
SANDRA B. ROBINSON,
1101 Pennsylvania Avenue, N.W. Suite 1010
Washington, D.C. 20004

*Defendants.*

Civil Action No.:

CLASS ACTION COMPLAINT
FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF
## FEDERAL SECURITIES LAWS

Plaintiff, City of Boca Raton General Employees Pension Plan ("Plaintiff"), alleges the

following based upon the investigation of Plaintiff's counsel, which included, among other

things, a review of the defendants' public documents, conference calls and announcements made

by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and

press releases published by and regarding Harman International Industries, Inc. ("Harman" or the

"Company"), securities analysts' reports and advisories about the Company, and information

readily available on the Internet.

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of all purchasers of the common stock of

Harman between April 26, 2007 and September 24, 2007, inclusive (the "Class Period"), seeking

to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Harman International Industries is a manufacturer of high quality, high fidelity audio products and electronic systems for the automotive, consumer and professional markets. Its brands include Harman Kardon, JBL, Mark Levinson, and Infinity among others.   The Company's stock is traded on the New York Stock Exchange under the Symbol: HAR.

3.      Throughout the Class Period, defendants failed to disclose material facts regarding the Company's true performance and prospects.   Specifically, defendants failed to disclose that: (a) the Company had breached the merger agreement with KKR and GSCP and therefore placed the Merger in serious doubt; (b) the Company needed to sustain higher R&D costs primarily related to its automotive platform awards; (c) the Company's inventory was greater than disclosed and was negatively impacting its cash flows; (d)  that its relationship with automaker, Daimler-Chrysler had materially worsened; (e) a material adverse change in Harman's business had occurred which related to capital spending; (f) the Company's financial health had generally deteriorated; and (g) as a result of the above, the Company's statements about true performance and future prospects were lacking in reasonable basis when made.

4.      On April 26, 2007 Harman issued a press release announcing a merger with a company formed by investment funds affiliated with or sponsored by private equity firms Kohlberg Kravis Roberts & Co., L.P. ("KKR") and GS Capital Partners VI Fund, L.P. ("GCSP") (KKR and GSCP are collectively referred to as "Purchasing Companies" herein).  The release trumpeted the transaction valued at approximately eight billion dollars ($8,000,000,000).   The merger agreement was based on the Company's current financial condition and future growth prospects.

5.      On September 21, 2007, the Company shocked the market when it announced that the Purchasing Companies no longer intended to complete the transaction.  According to the

2

Company the Purchasing Companies "informed Harman that they believe that a material adverse changes in Harman's business has occurred, that Harman has breached the merger agreement and they are not obligated to complete the merger."

6.     After this announcement, shares of Harman's stock fell from the previous day's close of $112.34 to a close of $85.00 on September 21, 2007. By the next trading day, September 24, 2007, the stock price had fallen further to close at $80.31 due to adverse and surprising news concerning excessive research and development costs, decreased cash flow, and the possibility that there would be no earnings growth in the next fiscal year. Over the course of two trading days the Company's stock price declined more than $31 on abnormally high trading volumes.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and pursuant to 28 U.S.C. §1331. The claims asserted in this Complaint arise under Sections 10(b) and 20(a) of the Exchange Act of 1934, 15 U.S.C. §78j(b) and §78t(a), and Rule 10-b, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC, and therefore present federal questions.

8.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and pursuant to 28 U.S.C. §1391(b). At all relevant times to this Complaint, Harman has had its corporate headquarters in this Judicial District. In addition, the wrongful conduct complained of in this Complaint, including the materially false and misleading statements that were prepared and disseminated to the investing public, occurred within this Judicial District.

9.     In connection with the acts, conduct and other wrongs alleged in this Complaint, the Defendants, directly and indirectly, used the means and instrumentalities of interstate

commerce including, but not limited to, the United States mail, interstate wire and telephone facilities, the facilities of the national securities markets and the Internet to distribute the false and misleading statements alleged herein.

### PARTIES

10.     Plaintiff, City of Boca Raton General Employees Pension Plan, as set forth in the accompanying certification, incorporated by reference herein, purchased Harman's common stock at artificially inflated prices during the Class Period and has been damaged thereby.

11.     Defendant, Harman is a Delaware corporation with its principal executive offices located at 1101 Pennsylvania Avenue, N.W. Suite 1010, Washington, D.C. 20004.

12.     Defendant, Dr. Sidney Harman ("Dr. Harman") was, at all relevant times, the Company's founder and Executive Chairman of the Board of Directors. Dr. Harman also served as the Company's Chief Executive Officer ("CEO") from January 1, 2007 to June 30, 2007.

13.     Defendant, Kevin Brown ("Brown") was, at all relevant times, the Company's Executive Vice President and Chief Financial Officer ("CFO").

14.     Defendant, Sandra B. Robinson ("Robinson") was, at all relevant times, the Company's Vice President of Financial Operations and Chief Accounting Officer. Robinson also exercised and sold a significant amount of Harman stock options during the Class Period.

15.     Defendants, Dr. Harman, Brown, and Robinson are collectively referred to hereinafter as the "Individual Defendants."

### CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this case as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of itself and all other persons or entities who purchased Harman common stock from April 26, 2007 to September 24, 2007, inclusive.

Excluded from the Class are Harman, its subsidiaries and affiliates, the Defendants, the Individual Defendants, members of the Defendants' immediate families, their legal representatives, heirs, successors and assigns and any person acting in concert with or under the control of any Defendant.

17.     During the Class Period, Harman's common stock was actively traded on an impersonal and efficient trading market, the NYSE. The members of the Class, for whose benefit this action is brought, are so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, Plaintiff reasonably believes that there are thousands, if not tens of thousands, of members of the Class.

18.     Plaintiff's claims are typical of the claims of other Class Members because the damages suffered by Plaintiff and all members of the Class arise from Defendants' wrongful conduct as alleged in this Complaint. Specifically, Plaintiff's claims and the claims of members of the Class arise out of the Defendants' issuance of false and misleading statements and false financial reporting during the Class Period.

19.     Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and has retained counsel competent and experienced in class action securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, the interests of the Class it seeks to represent.

20.     A class action is superior to the other available methods for the fair and efficient adjudication of the claims asserted in this Complaint because the Class is so numerous and geographically dispersed throughout the United States that it would be impractical for each member of the Class to bring separate actions or be joined in one individual action. Furthermore, because the damages suffered by the individual Class members may be relatively small, the

expense and burden of individual litigation make it virtually impossible for the Class members to separately address the wrongs done to them.  The likelihood of individual Class members prosecuting separate claims is remote.  Also, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and possibly conflicting adjudications of the claims asserted herein.

21.    Plaintiff anticipates no unusual difficulties in the management of this case as a class action.  The names and addresses of record owners of the shares of Harman's common stock may be determined through the transfer agent, and notice can be provided to such persons through appropriate means of notice through publication, mailing and notices over business wire services in a form similar to those customarily used in class action litigation arising under the federal securities laws.

22.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the common questions of fact are:

(a)    whether the federal securities laws were violated by the Defendants' acts as alleged in this Complaint;

(b)    whether Defendants participated in the alleged fraudulent scheme;

(c)    whether Defendants misrepresented or failed to disclose material facts regarding the Company's business, management, operations, and financial condition, as more fully particularized herein;

(d)    whether the Individual Defendants are "controlling persons" as the term is defined in Section 20(a) of the Exchange Act;

(e)     whether the price of Harman's common stock was artificially inflated during the Class Period due to the material misrepresentations and omissions complained of herein; and

(f)     whether the members of the Class have sustained damages, and if so, what is the proper measure of such damages.

## FRAUD-ON-THE-MARKET DOCTRINE

23.     Plaintiff will rely, in part, upon reliance established by the fraud on the market doctrine.  The market for Harman common stock was at all times an efficient market for the following reasons:

(a)     Harman common stock met the requirements for listing and was listed on the NYSE, a highly efficient and automated market, under the ticker symbol HAR;

(b)     as a company registered pursuant to the provisions of the Exchange Act, Harman filed periodic public reports with the SEC and NYSE and was subject to the requirements for providing timely and accurate information to the investing public pursuant to the rules and regulations of the SEC;

(c)     Harman securities trading volume was substantial during the class period;

(d)     Harman was followed by various securities analysts, who wrote reports that were available through various automated retrieval services;

(e)     Harman regularly communicated with public investors, analysts and market professionals generally regarding the release of current information, and generally assured that information was released over major newswire services on a current basis; and

(f)     the market price of Harman reacted efficiently to new information entering the market.

24.    The above facts demonstrate the existence of an efficient market for Harman

stock and make applicable the fraud on the market doctrine. Thus, Plaintiff and other members

of the Class are entitled to a presumption of reliance with respect to the misstatements and

omissions alleged in this Complaint.

## FACTUAL ALLEGATIONS

### Materially False and Misleading Statements Made During the Class Period

25.    The Class Period begins on April 26, 2007. On this day, Harman issued a press

release titled "Harman International Industries to be Acquired by KKR and GS Capital Partners."

In the release, the Company stated:

> **Harman Stockholders Can Elect to Receive the $120 Per Share
> In Cash or Shares in Post-Transaction Company**
>
> **Transaction Valued at Approximately $8 Billion**
> Harman International Industries, Inc. (NYSE:   HAR) today
> announced that it has entered into an agreement to be acquired by
> affiliates of Kohlberg Kravis Roberts & Co. L.P. ("KKR") and GS
> Capital Partners ("GSCP") in a transaction valued at approximately
> $8 billion. The transaction was unanimously approved by the
> Harman Board of Directors, following the recommendation of a
> Special Committee of independent directors. KKR initiated
> discussions with Harman and structured the transaction so that
> current Harman stockholders have the opportunity to participate in
> the future upside potential of the enterprise. The company will
> continue to be named Harman International Industries and Dr.
> Sidney Harman, Founder and Executive Chairman, will remain
> Executive Chairman.
>
> * * *
>
> Under the terms of the agreement, Harman stockholders will be
> entitled to receive $120 in cash for each share of Harman common
> stock they hold. As an alternative to receiving the cash
> consideration, Harman's stockholders will be offered the
> opportunity to elect, on a purely voluntary basis, to exchange some
> or all of their shares of Harman stock for shares in the new
> corporation is approximately 8.3 million, which would represent
> $1.0 billion (at the $120 per share transaction value) and an

approximate 27% equity stake in Harman following the transaction. If elections for post-transaction shares exceed the $1.0 billion cap, post-transaction shares will be allocated to electing stockholders on a pro-rated basis, and the remaining Harman shares will be exchanged for cash. The election process will be fully detailed in the proxy statement/prospectus that will be mailed to Harman stockholders.

Dr. Harman, who owns approximately 5% of the outstanding common stock of Harman, will participate in the same election process available to all stockholders. He has committed that he will elect to exchange half of his current holdings for post-transaction shares, subject to the same pro ration that applies to all shareholders as described above.

26.     Defendant Dr. Harman, in the same press release, commenting on the agreed to merger stated:

We are pleased to reach an agreement with KKR and GSCP that is in the best interest of our stockholders, presenting them with excellent value for their shares and the opportunity to participate in Harman's future growth. KKR and GSCP are two of the world's leading private equity investors and our Board of Directors strongly believes that this transaction will create attractive long-term opportunities for our employees, customers and business partners. Together, we will continue to execute our strategic plan, capitalize on new opportunities, and build on our history of product innovation and service excellence.

27.     Also on April 26, 2007, Harman held a conference call to discuss its third quarter 2007 performance. During the conference call, Dr. Harman stated in part:

First, a comment on the agreement we announced this morning, which merges Harman International into a new company to be financed by Kohlberg Kravis Roberts and Goldman Sachs. The new company will carry the Harman International name. I will be its Executive Chairman and a substantial investor. We think very well of the deal.

It has been structured to provide shareholders with a substantial premium for their shares and, if they elect so, to retain a substantial portion of their investment in the Company going forward. The deal rewards our loyal shareholders, a substantial number of whom have been owners for many years, and it recognizes the dedication,

hard work, and commitment of our people. Until we have moved the transaction through the SEC and other legal processes, we are constrained in what we can say. However, a few highlights may be helpful.

* * *

We begin the fourth quarter of the year and we look to fiscal '08 with a backlog of $14 billion. We continue to expect fiscal '08 Automotive OEM revenues at $2.8 billion and EPS of $5.25, subject to the probability that we will not be able to absorb the $46 million engineering bulge I identified in our previous earnings call. Let me remind that the bulge is driven by work on $1.1 billion of new business unanticipated when we first planned fiscal '08 and by continuing to new work on Driver Assist. If we are unable to absorb the $46 million R&D bulge the projected fiscal '08 EPS would become $4.79.

We have not received a major new award since our last earnings call, but there is a flow of good award that add extra fiber to the backlog. Land Rover has committed its branded audio business to Harman Kardon for the period fiscal 2011 through 2015. The estimated annual revenue is $50 million, with total value of $250 million. This is business that we had coveted, but now has been formally awarded.

Permit me to offer a perspective going forward. **Ours is a very healthy business, as we have a special place in both the automotive OEM and the professional sides of our work.** But we have no conceit that this is a walk in the park. There are challenges as there are opportunities throughout the markets and throughout the technologies with which we work. Those opportunities include geographic expansion in Asia, and especially in China. They include a further expansion of infotainment through midrange and entry-level automobiles. And they include the promising and challenging new arena of Driver Assist. We are hard at work in all three areas. We have made consequential progress in scaling our systems through the midrange and entry-level, and we are confident that our competitive and comparative advantage on the infotainment side will serve us very well on the Driver Assist side.

* * *

As I look forward to our future in OEM, I see an interesting assembly of opportunity and challenge. I have already spoken about market opportunity. **Here, I recognize and emphasize that**

**recognition, that our growth has been accompanied by variances in efficiency. We are determined to rationalize our engineering and to reduce significantly the percentage of sales that R&D represents. I have spoken about this before. I mention it now because I have some major new insight, but precisely to emphasize the fact that it is before us, that we have our work cut out, but we intend to get it done.**

28.    Additionally, during the question and answer period of the call, Dr. Harman made

the following remarks regarding the Company's R&D expenses in response to an analysts

question:

> JEFF KESSLER:  I guess the question that we have is around continuing to match R&D to the revenue structure as you see it, given that you have programs in place that are obviously important and obviously have a lot of potential.  But getting your hands around the expense levels relative to new programs, are there some – you've mentioned one or two that are in line to product over the next several years.  **Is there anything that we should be aware of which is may be going to change that R&D-to-revenue percentage, let's say, 18 months out or so?**
>
> SIDNEY HARMAN:  Are you asking whether the percentage of revenue represented by R&D will increase or decrease?
>
> JEFF KESSLER:  I'm asking, again, how are you going to get that decrease?  In other words, where is the return on that R&D going to come from?
>
> SIDNEY HARMAN:  I've got it.  In two ways, really.  Understand first that the increase is, from our point of view, a very constructive thing.  The so-called bulge was generated by the receipt of awards that we did not contemplate when we were generating the plan and generating our guidance.  The engineering represented in that bulge is essentially for the new BMW award and the development of Driver Assist, which we believe has very positive implications down the road.  I have not yet answered your question, but I thought it useful to set that base.
>
> Now we believe – and I have made this clear numbers of times – we believe that in the growth of the Company and in the urgency of getting the job done in what was substantially new world of technology, the primary objective was just that – get it done and, in effect, damn the cost.  We are still in that surge mood.  I should be

11

careful about the use of that word, I suppose. **But I am convinced, Kevin is convinced, our Board is convinced that over time – and reasonable time – we can rationalize that engineering so that as a percentage of sales – and remind you, sales will be going up, so that if the engineering expense stayed fixed, the percentage would decline, so it moves constructively in that direction – but we believe that we can rationalize, generate efficiencies such as to permit us to improve that percentage by approximately 100 basis points a year over the next several years.**

29.     During the same call, defendant Brown also spoke further about the Company's

Research & Development expenses. He stated, in part:

> Total Harman International R&D expenses in the third quarter were $90 million, or 10.2% of sales, compared to $74 million, or 9.2% of sales, in the same quarter of the prior year. As Sidney discussed, R&D is trending higher than we had anticipated as we work to develop new technologies and new programs. We expect fiscal 2007 R&D expenses to approximate 10% of full-year sales. In fiscal 2008, we anticipate R&D will begin to decrease as a percentage of sales. The increase in R&D explains $16 million of the $20 million increase in SG&A in the third quarter compared to the prior year. Despite the increase in R&D total SG&A as a percent of sale remained relatively flat at 23% of sales in the quarter.

30.     The Company filed a Form 8-K with the SEC on April 27, 2007 providing further

guidance on the merger agreement with the Purchasing Companies. The Form 8-K was signed

by defendant Robinson and stated, in relevant part, the following:

> On April 26, 2007, Harman International Industries, Incorporated, a Delaware corporation (the "Company"), entered into an Agreement and Plan of Merger with KHI Parent Inc., a Delaware corporation ("parent"), and KHI Merger Sub, Inc., a Delaware corporation and wholly owned subsidiary of Parent ("Merger Sub")
>
> The Merger Agreement provides for the merger of Merger Sub with and into the Company (the "Merger"), with the Company surviving the Merger as a wholly owned subsidiary of Parent. Merger Sub and Parent are affiliates of Kohlberg Kravis Roberts & Co., L.P. ("KKR") and GS Capital Partners ("GSCP", and together

with KKR, the "Sponsors") formed by the Sponsors in order to acquire the Company

\* \* \*

The Board of Directors of the Company has unanimously determined that the Merger is in the best interests of the Company and its stockholders, and declared advisable, to enter into the Merger Agreement, approved the Merger Agreement and resolved to recommend adoption of the Merger Agreement by Company stockholders.

The closing of the Merger is subject to customary closing conditions, including adoption of the Merger Agreement by the Company's stockholders and antitrust clearance. Closing is not subject to any financing condition but the closing may be delayed in certain circumstances to facilitate financing. The merger is expected to be completed in the third calendar quarter on 2007.

\* \* \*

The Company has made customary representations and warranties in the Merger Agreement and agreed to customary covenants, including covenants regarding operation of the business of the Company and its subsidiaries prior to the closing.

\* \* \*

The Merger Agreement has been included to provide investors and security holders with information regarding its terms. It is not intended to provide any other factual information about the Company, Parent, or their respective subsidiaries and affiliates. The Merger Agreement contains representations and warranties by the Company, on the one hand, and by Parent and Merger Sub, on the other hand, made solely for the benefit of the other. The assertions embodied in those representations and warranties are qualified by information in confidential disclosure schedules that the parties have exchanged in connection with signing the Merger Agreement. The disclosure letter delivered to Parent in connection with the Merger Agreement contain information that modifies, qualifies and creates exceptions to the representation and warranties set forth in the Merger Agreement. Moreover, certain representations and warranties in the Merger Agreement were made as of a specified date, may be subject to a contractual standard of materiality different from what might be viewed as material to stockholders, or may have been used for the purpose of allocating risk between the Company, on the one hand, and Parent and Merger Sub, on the other hand. Accordingly, the representations and warranties in the Merger Agreement should not

be relied on by any persons as characterizations of the actual state of facts about the Company, Parent or Merger Sub at the time they were made otherwise.

31.    On August 24, 2007 the Company held a conference call to discuss its fourth quarter performance. During the call, Dr. Harman stated, in part:

> **Our dominance in the automotive space was solidified through the past year, where we had earlier confronted doubt about our ability to move effectively beyond the luxury car market for our infotainment systems. That doubt has been erased. With earlier awards to us from PSA, Audi, and Chrysler, we established our leadership in the mid-range and entry levels, with last year's major awards from BMW, we erased any remaining questions. We are moving form an era in which each new infotainment system represented a virtually original effort with all new R&D to a new era in which the major automotive makers are committing to a common electronics platform, applicable across the full range of car lines.** That growing set of decisions represents a dramatic shift form the traditional emphasis by automakers on multiple suppliers, to a readiness to commit across the board to a single supplier. That dramatic decision  is driven overwhelmingly by new technology, and by the advantage in cost and performance available from a common scalable electronics platform.
>
> Moving into fiscal 2008, our position is further enhanced by our developing technology partnership with Intel and the exclusive opportunity it provides us to employ Intel's powerful new mobile processor in our new designs. Implicit in that application is greater speed, significant improvement in graphic realization, and impressively useful extension of our functionality. We believe that we are in a unique position to move quickly and impressively to build our order book for the second decade of the 21st century.

32.    Also during the August 24 conference call, Dinesh Paliwal, the new Chief Executive Officer and President of Harman, stated, in part:

> During the past few weeks, I visited several key Harman business locations, and met with several hundred employees in Europe and North America.  Although it is still relatively early to form opinions, several positive aspects of the company, which were the basis of my decision to join Harman, have been validated. **I'm excited – actually, I'm excited about the opportunities in the**

**premium automotive and professional sectors of our business. I'm equally excited about the growth rates and the growing market size of the mid-market segments in the developed world, and emerging markets in eastern Europe and so-called BRIC – Brazil, Russia, India, and China -- countries.**

Harman is a potent global brand and I'm determined to penetrate these markets.  I feel pretty strongly about it.  **Our product portfolio is robust and our R&D in close collaboration with leading customers will keep us ahead of competition.** Converting these opportunities into profitable business will require a strong management team and peer accountability at all levels.

33.    The Company filed its 10-K with the SEC on August 29, 2007.  The 10-K was signed by the Individual Defendants and stated, in relevant part, the following:

On April 26, 2007, we entered into an Agreement and Plan of Merger with KHI Parent Inc., a company formed by investment funds affiliated with KKR and GSCP.  The merger agreement provides for the merger of KHI Merger Sub Inc. with and into our company, with our company surviving the merger as a wholly owned subsidiary of Parent.  KHI Merger Sub and Parent were formed to acquire our company.

If the Merger agreement is adopted by our stockholders and the merger is completed, our stockholders will be entitled to receive $120.00 in cash, without interest, for each share of Harman common stock owned at the completion of the merger.  As an alternative to receiving the $120 per share, our stockholders have the opportunity to elect, on a purely voluntary basis, to exchange some or all of their shares of Harman common stock, on a one-for-one basis, for shares of common stock of Parent.  The right to elect to receive shares of Parent common stock is available to all Harman stockholders and option holders.  However, the number of Parent shares our stockholders and option holders will receive may be less than they request in the event that elections to receive shares of Parent common stock would require Parent to issue more than 8,333,333 shares of Parent common stock.  This number of Parent shares represents approximately 27% of the equity interests in Parent that will be outstanding immediately following the merger based on the expected equity financing for the merger.  If the total elections for Parent shares exceed that maximum number, then the shares of Parent common stock will be allocated to electing Harman stockholders and option holders on a pro rata

basis and the remaining Harman shares and options will be converted into cash.

Our Board of Directors, upon the recommendation of a committee of independent directors, has unanimously approved and declared advisable the merger agreement and the transactions contemplated by the merger agreement, determined that the terms of the merger agreement are fair to, and in the best interests of, our company and our stockholders and resolved to recommend that our stockholders vote in favor of the adoption of the merger agreement.

Completion of the merger is subject to the approval of our stockholders and other customary closing conditions, including regulatory approvals and antitrust clearances.    We presently anticipate that the merger will be completed in the fourth quarter of calendar year 2007.

* * *

Selling, general and administrative ("SG&A") expenses as a percent of net sales were 23.2 percent in fiscal 2007 compared to 23.3 percent in the prior year.    **Research & Development ("R&D") costs are the largest component of our SG&A expenses.  In fiscal 2007, R&D costs were $356.7 million or 10.0 percent of net sales.  In fiscal 2006, R&D costs were $302.0 million, or 9.3 percent of net sales.  The increase was primarily due to costs incurred to support new infotainment system awards from automotive customers.  We expect R&D costs, as a percentage of net sales, to decrease approximately 1 percentage point in fiscal 2008 due to the increasing scalability of our infotainment systems and the beginning of production for certain automotive programs.**  SG&A expenses also include employee compensation and benefit costs.  We have recorded stock-based compensation expense under the fair value based method since fiscal 2003, including $15.4 million, $16.6 million and $14.3 million in fiscal 2007, 2006, and 2005, respectively.

* * *

Automotive – Automotive R&D costs were $286.5 million in fiscal 2007, representing 11.5 percent of net sales.  Fiscal 2006 R&D costs were $232.2 million, or 10.4 percent of net sales.  **These costs were incurred to develop audio, electronic and infotainment systems for an expanding list of automotive platforms.  Our infotainment systems are increasingly based on scalable software allowing us to efficiently design systems for luxury, mid-range, and entry-level vehicles.**  During fiscal 2007, we received a major infotainment systems award from BMW

that will encompass virtually their entire model range. This sophisticated system will include HD and satellite radio capabilities, second and third dimensional navigation, traffic information, voice recognition, Internet browser and wireless connectivity. We also develop various systems for Mercedes-Benz, Audi, PSA Peugeot Citroen and Porsche in Europe. In the United States and Asia, we develop audio systems for Toyota, Lexus, Hyundai, Chrysler, and Harley-Davidson. Automotive SG&A expenses also include restructuring costs of $5.7 million in fiscal 2007 and $7.3 million in fiscal 2006.

34.     In addition to being signed by the Individual Defendants, the Company's Form 10-K was also certified pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 by defendants Dr. Harman and Brown.

35.     These statements, referenced above were false and misleading when made in that: (a) the Company had breached the merger agreement with KKR and GSCP and therefore placed the Merger in serious doubt; (b) the Company needed to sustain higher R&D costs primarily related to its automotive platform awards; (c) the Company's inventory was greater than disclosed and was negatively impacting its cash flows;  (d) the Company's relationship with Daimler-Chrysler had materially worsened; (e) a material adverse change in Harman's business had occurred which related to capital spending; (f) the Company's financial health had generally deteriorated; and (g) as a result of the above, the Company's statements about its financial well-being, earnings, and future prospects were lacking in reasonable basis when made.

### THE TRUTH EMERGES

36.     Prior to the stock market opening on September 21, 2007 the Wall Street Journal published an article titled "Harman's Suitors Sour on Buyout". The article stated, in part:

> Will New Discovery Prompt KKR, Goldman to Pull Out Of $8 Billion Agreement?
>
> The private-equity buyers of Harman International Industries Inc. are balking at completing the $8 billion purchase of the audio-

> equipment maker, people familiar with the matter said, as yet another leveraged buyout falls into a hostile tête-à-tête between buyer and seller.
>
> \* \* \*
>
> Amid a credit crunch and lackluster financial results from Harman, Mr. Kravis and other investors in the deal have soured on the transaction, say people familiar with the deal. In particular, says one of these people, the buyer have come across new information that makes them less sanguine about the deal. It is unclear what that information is, however, and whether it could have direct bearing on breaking the deal or would be used to negotiate a lower purchase price.

37.     On this information, shares of Harman's common stock fell from a previous closing price on September 20, 2007 of $112.25 to open trading at $97.70 on September 21, 2007.

38.     On September 21, 2007, the Company issued a press release titled "Harman Comments On Previously Announced Merger." The Press release stated, in relevant part, the following:

> Harman International Industries, Incorporated (NYSE: HAR) announced that it was informed this afternoon that Kohlberg Kravis Roberts & Co. L.P. (KKR) and GS Capital Partners VI Fund, L.P. (GSCP) **no longer intend to complete the previously announced acquisition of Harman by a company formed by investment funds affiliated with or sponsored by KKR and GSCP. KKR and GSCP have informed Harman that they believe that a material adverse change in Harman's business has occurred, that Harman has breached the merger agreement and that they are not obligated to complete the merger.** Harman disagrees that a material adverse change has occurred or that it has breached the merger agreement.

39.     On this news, shares of Harman's common stock fell from an opening price of $97.70 to close at $85.00 on September 21, the same day as the announcement of the Sponsor's intention to not complete the merger.

40.    On the same day, the Associated Press published an article titled "Equity Firms

Back Out of Harmon Buyout." The article stated, in part, that:

> Kohlberg Kravis Roberts & Co. and Goldman Sachs Group Inc.'s
> private equity unit told the company they are under no obligation
> to complete the merger because "a material adverse change" in its
> business had occurred, Harman said in a statement.
>
> * * *
>
> Investors punished the stock all day long as word dripped out that
> KKR and GS Capital Partners were attempting to nullify the deal.
> By the end of the day, Harman shares had plummeted by more
> than 24 percent.
>
> **A person familiar with the negotiations who asked not to be
> named because he was not authorized to speak publicly told
> The Associated Press that the private equity firms sought to
> squash the deal over questions about Harman's financial
> health, not because of any financing difficulties in a tight credit
> market. The person said the effort to back out was not a
> negotiating tactic.**

41.    On the same day, Reuters published an article regarding the merger giving

additional details regarding the Purchasing Companies pullout of the merger agreement. The

article states in part:

> Harman International Industries Inc said its private equity buyers
> are pulling out of their $8 billion buyout deal, a severe blow to the
> company whose shares fell more than 25 percent on Friday.
>
> The audio equipment maker said that Kohlberg Kravis Roberts &
> Co LP and Goldman Sachs Group Inc's private equity arm believe
> a "material adverse change" occurred in Harman's business and
> that it breached the merger agreement.
>
> * * *
>
> But the Harman bail-out looks centered on the financial conditions
> of the company itself, not the lending agreement, and marks the
> first time in a two-year private equity acquisition frenzy that
> buyers walked out of a major deal.

Merger arbitrage traders and analysts said among the hurdles Harman faced was rising inventories and declining cash flows and sales in the last few quarters. Traders also said questions surfaced recently about Harman's relationship with Daimler-Chrysler, a customer for its audio products.

\* \* \*

One analyst said Harman's inventories in February were up 40 percent, while second-half sales expectations were for an 11 percent rise.

"When you've got inventories going through the roof, cash flows are going to get hit," said Alisa Guyer Galperin, an analyst covering Harman at independent research firm RiskMetrics Group.

The merger proxy does have language in it on pertaining the deal being threatened in the event of certain "material adverse" effect on Harman.

"The company either has to slow production, reduce prices, or have inventories remain at elevated levels, and that deteriorates your cash flow model," Galperin said, adding that personal navigation devices for cars were among the items sitting in inventory.

Traders said on Friday that a great deal of attention was being paid to a filing showing that sales to DaimlerChrylser accounted for 25 percent of Harman's total consolidated net sales for the fiscal year ended June 30, 2007. Cerberus Capital recently bought Chrysler from Daimler.

42.     Also on September 21, Forbes published an article regarding the merger that

stated:

### KKR and Goldman Dump Harman

Harman, it's not us, it's you. This what the audio-manufacturing firm claims it just heard from would-be buyers KKR and Goldman Sachs when they backed out a deal Friday to buy the firm. Harman then told the world the news, just slightly ahead of the closing bell at the New York Stock Exchange.

\* \* \*

Although the exact reason for the drawback is not known yet, Harman's fourth quarter and full year results did fall short of Wall Street's expectations. In the fourth quarter Wall Street expected earnings of $1.24 and Harman yielded 98 cents. Full year of fiscal 2007 Wall Street requested $4.38 and Harman yielded $4.14.

\* \* \*

Prior to the release, the NYSE had contacted Harman regarding its price drop, and requested it release information pertaining to the drop.

After the company declined the NYSE then released its own report that Harman had denied its request. Shortly after its denial, Harman changed course and told the NYSE it would make a press release. In accordance with regulation, the exchange halted the stock from trading.

43.     On September 24, 2007, Harman issued a press release titled "Harman Provides

Guidance For Fiscal 2008." The release stated, in part, that:

> **The Company expects fiscal 2008 performance to be impacted by a number of factors including increased R&D to support the development of several new infotainment platforms and associated launch costs. We now expect fiscal 2008 sales to reach $4.1 billion ($3.55 billion in 2007). The Company expects operating income and diluted EPS before merger related costs to equal or exceed last year's record performance.** In 2007, operating income was $397 million and diluted EPS were $4.14 adjusted for non-recurring restructuring charges, merger costs and tax items.
>
> **For the quarter ending September 30, 2007 we estimate net sales of $950 million, operating profit of $40 million and diluted EPS of $.50 before merger-related costs. As previously disclosed, the fourth quarter of fiscal 2007 and the first quarter 2008 were affected by increased R&D costs, primarily related to recent automotive platform awards.** We expect substantial margin improvements over the course of fiscal 2008 as we work through these costs and begin the launching of new infotainment platforms."
>
> "In light of increases in material costs and faster ramp-up of R&D resources to work on new business awards, equaling the record operating performance of fiscal 2007 is an achievement. The

> benefits of common platform synergy and scalability will be
> realized in fiscal 2009 and beyond. Those benefits will strengthen
> our operating profits," said Paliwal.

44.    On this information, Harman's common stock price fell to a close of $80.31 on

unusually high trading volume exceeding 14.5 million shares.    Within two trading days

Harman's stock had lost close to $32 per share on trading volumes far in excess of normal

volumes for the Company.

## SCIENTER ALLEGATIONS

45.    As alleged herein, Defendants, as officers, directors and/or controlling persons of

a publicly held company whose securities are registered with the SEC under the Securities Act of

1933, traded on the NYSE, and governed by the provisions of the Exchange Act, the Individual

Defendants had a duty to promptly disseminate accurate and truthful information with respect to

Harman's operations and financial condition, and to correct any previously issued statements that

had become untrue, and to disclose any trends that could materially affect earnings and the

present and future operating results of Harman, so that the market price of its publicly traded

securities would be based on truthful and accurate information.

46.    During the Class Period, the Individual Defendants were senior officers and/or

directors of Harman and were privy to confidential and proprietary information concerning

Harman, its operations, finances, financial condition, revenues and present and future business

prospects. Because of their possession of such information, the Individual Defendants acted with

scienter in that they knew that the public documents and statements, issued or disseminated by or

in the name of the Defendants or the Company were materially false and misleading; knew or

recklessly disregarded that such statements or documents would be issued or disseminated to the

investing public; and knowingly and substantially participated in the issuance or dissemination of

22

such statements or documents, and are primary violators of the federal securities laws. The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Harman's business operations, their control over Harman's allegedly materially misleading misstatements and/or their control over and close association with the Company, which make them privy to confidential information concerning all of Harman's activities and operations, were active and culpable participants in the fraudulent scheme alleged herein. The Individual Defendants, and, through them, Harman, knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described in this Complaint could not have been perpetrated without the knowledge and complicity of the Individual Defendants, who were Harman's top executives and hands-on managers.

47.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Harman's securities by disseminating materially false and misleading statements and/or concealing material, adverse facts. The scheme: (i) deceived the investing public regarding Harman's business, operations, and management about the intrinsic value of Harman securities and (ii) caused the Plaintiff and the other members of the Class to purchase Harman's securities at artificially inflated prices.

## NO SAFE HARBOR

48.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. To the extent any of the specific statements pleaded herein were identified as "forward-looking statements," there were no meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements.

49.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and approved by executive officers of Harman who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

50.     Plaintiff repeats and re-alleges each and every allegation as if set forth in full herein.

51.     Throughout the Class Period, Defendants, singly and in concert, directly or indirectly, engaged in a common plan, scheme and course of conduct described herein, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiff and other members of the Class; made various false statements of material facts and omitted to state materials to make the statements made not misleading to Plaintiff and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of Harman stock.

52.     The purpose and effect of Defendants' plan, scheme and course of conduct was to artificially inflate the price of Harman stock and to artificially maintain the market price of Harman securities.

53.    Defendants, which includes the top officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Harman personnel to the SEC, securities analysts and members of the investing public, including Plaintiff and the Class.

54.    As a result of the foregoing, the market price of Harman securities was artificially inflated during the Class Period. In ignorance of the falsity of the reports and statements, and the material misstatements by Defendants regarding the financial condition and growth prospects of Harman during the Class Period, as well as the deceptive and manipulative devices and contrivances employed by Defendants, Plaintiff and the other members of the Class relied, to their damage, on the reports and statements described above and/or the integrity of the market price of Harman during the Class Period in purchasing Harman common stock at prices which were artificially inflated as a result of Defendants' false and misleading statements.

55.    Plaintiff, and the other members of the Class, would not have purchased Harman common stock at artificially inflated prices had they known of the material adverse information which Defendants did not disclose.

56.    Defendants' concealment of this material information served only to harm Plaintiff and the other members of the Class who purchased Harman common stock in ignorance of the financial risk to them as a result of such non-disclosures.

57.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

58.     By reason of the foregoing, Defendants have violated Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for the substantial damages which they suffered in connection with their purchase of Harman common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act Against the Individual Defendants

59.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

60.     During the Class Period, the Individual Defendants by virtue of their offices and/or directorships and their specific acts were, at the time of the wrongs alleged herein, controlling persons of Harman within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Harman to engage in the illegal conduct and practices complained of herein by causing the Company to disseminate to the public, or through analysts, the materially false and misleading information referred to above.

61.     The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class by Harman during the Class Period.

62.     By reason of the conduct alleged in the First Count for Relief, Defendants Dr. Harman, Brown, and Robinson are liable for the aforesaid wrongful conduct and are liable to the Plaintiff and the members of the Class for the substantial damages which they suffered in connection with their purchases of Harman common stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, on its own behalf, and on behalf of the other members of the Class, pray for judgment as follows:

(a)  Declaring this action to be a proper class action, certifying Plaintiff as Class representatives and its counsel as Class Counsel;

(b)  Declaring and determining that the Defendants violated the federal securities laws by reason of their conduct as alleged herein;

(c)  Awarding money damages against the Defendants, jointly and severally, in favor of Plaintiff and the other members of the Class for all losses and injuries suffered as a result of the acts and transactions complained of herein, together with prejudgment interest on all of the aforesaid damages which the Court shall award from the date of said wrongs to the date of judgment herein at a rate the Court shall fix;

(d)  Awarding Plaintiff its costs and expenses incurred in this action, including reasonable attorneys', accountants' and experts' fees; and

(e)  Awarding such other relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 30, 2007

Respectfully submitted,

By: _____

**STRAUS & BOIES, LLP**
Timothy D. Battin, Esq.
D.C. Bar No. 436303
4041 University Drive, Suite 500
Fairfax, VA 22030
Telephone: (703) 764-8700
Facsimile (703) 764-8704

**MAGER & GOLDSTEIN LLP**
Jayne Arnold Goldstein, Esq.
1640 Town Center Circle, Suite 216
Weston, FL 33326
Telephone: (954) 515-0123
Facsimile: (954) 515-0124

**LOCKRIDGE, GRINDAL, NAUEN
P.L.L.P.**
Richard A. Lockridge, Esq.
Karen H. Riebel, Esq.
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

**FINE, KAPLAN AND BLACK, R.P.C.**
Roberta D. Liebenberg
1835 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: (215) 567-6565
Fax: (215) 568-5872

**Attorneys For Plaintiff**

## CERTIFICATION OF REPRESENTATIVE PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Linda Davidson, Chairwoman of the Board for the City of Boca Raton General Employees' Pension Plan ("Boca Raton General") and on behalf of Boca Raton General, ("Plaintiff") duly swear and say, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed the complaint styled, City of Boca Raton General Employees' Pension Plan v. Harman International Industries, Inc., et al and authorize the filing of a substantially similar complaint on my behalf.

2.    Boca Raton General did not purchase the securities, exercise options or enter into any agreement that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Boca Raton General is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Boca Raton General purchased shares in Harman International Industries, which company is the subject of this action, during the Class Period as follows:

| Acquisition Date | Number of Shares | Price Per Share |
| --- | --- | --- |
| 5/11/2007 | 100 | 119.61 |
| 5/21/2007 | 100 | 118.40 |
| 5/30/2007 | 100 | 117.98 |
| 6/7/2007 | 100 | 117.85 |
| 6/25/2007 | 100 | 116.54 |
| 7/5/2007 | 100 | 116.64 |
| 7/31/2007 | 200 | 116.47 |
| 8/8/2007 | 100 | 116.94 |
| 8/16/2007 | 200 | 111.35 |
| 8/24/2007 | 100 | 113.95 |

| | | |
|---|---|---|
| 9/4/2007 | 300 | 113.17 |
| 9/12/2007 | 400 | 112.96 |
| 9/20/2007 | 200 | 112.18 |

5.     As of this date Boca Raton General has not sold any of its shares.

6.     Boca Raton General has served as a class representative in *In re Sara Lee Litigation*, No. 03cv3203 (N.D.IL). Boca Raton General has not served, nor sought to serve, as a class representative in any federal securities fraud cases in the last three years.

7.     Boca Raton General will not accept any payment for serving as a representative party on behalf of the class beyond the plaintiff's pro rata share of any recovery, or as ordered or approved by the Court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27 day of November, 2007.

Linda Davidson, Chairwoman
City of Boca Raton General Employees' Pension Plan.

Signature

Telephone No. 561.393.7737

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

City of Boca Raton General Employees Pension Plan, on behalf of itself and all others similarly situated

## DEFENDANTS

Harman International Industries, Inc., Dr. Sidney Harman, Kevin Brown and Sandra B. Robinson

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    11001
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Timothy D. Battin
Straus & Boies, LLP
4041 University Drive, Suite 500
Fairfax, VA 22030
(703) 764-8700

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
   Plaintiff

◉ 3 Federal Question
   (U.S. Government Not a Party)

○ 2 U.S. Government
   Defendant

○ 4 Diversity
   (Indicate Citizenship of
   Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

● **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☒ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. Habeas Corpus/ 2255 | ○ H. Employment Discrimination | ○ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

● 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

15 U.S.C. Sections 78j and t; the Claims asserted arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☒ ACTION UNDER F.R.C.P. 23    DEMAND $ _____   Check YES only if demanded in complaint   JURY DEMAND:   YES ☒   NO ☐

**VIII. RELATED CASE(S) IF ANY**    (See instruction)   YES ☒   NO ☐   If yes, please complete related case form.

DATE  11/30/2007    SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.